UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Case No. 16bk30240 |
| Denitza P. Manevska, | ) | |
| | ) | Chapter 7 |
| Debtor. | ) | |
| _____ | ) | |
| | ) | |
| Anthony Kontos, Independent Administrator | ) | |
| of the Estate of Charles Vournazos, deceased, | ) | |
| | ) | Adversary No. 17ap00064 |
| Plaintiff, | ) | |
| | ) | Judge Timothy A. Barnes |
| v. | ) | |
| | ) | |
| Denitza P. Manevska, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

TIMOTHY A. BARNES, Judge.

MEMORANDUM DECISION

The matter before the court arises out of the Adversary Complaint Objecting to and Opposing Dischargeability of Debt [Adv. Dkt. No. 1] (the "Complaint"), filed by Anthony Kontos (the "Plaintiff"), Independent Administrator of the Estate of Charles Vournazos (the "Decedent") in the above-captioned adversary case (the "Adversary"). The Complaint seeks a determination of dischargeability of debt under section 523(a)(4) of title 11 of the United States Code, 11 U.S.C. § 101, et seq. (the "Bankruptcy Code") and objects to the discharge of Denitza P. Manevska (the "Defendant") under sections 727(a)(3), (a)(4)(D), (a)(5) and (a)(6)(A) of the Bankruptcy Code.

For the reasons more fully set forth herein, the court concludes that the Plaintiff has pled alternative grounds to establish the nondischargeability of the debt due to the Plaintiff as well as deny the Defendant her discharge. While the Plaintiff has not proven all the grounds alleged, he has satisfied at least one of the grounds for denial of the nondischargeability of debt under section 523(a)(4). The Plaintiff is therefore entitled to a finding of nondischargeability on the elements he has established. Similarly, the Plaintiff has satisfied some but not all of the allegations under section 727(a). The Defendant's discharge will also be denied for those provisions of section 727(a) that the Plaintiff has proven.

## JURISDICTION

The federal district courts have "original and exclusive jurisdiction" of all cases the Bankruptcy Code.  28 U.S.C. § 1334(a).  The federal district courts also have "original but not exclusive jurisdiction" of all civil proceedings arising under the Bankruptcy Code or arising in or related to cases under the Bankruptcy Code.  28 U.S.C. § 1334(b).  District courts may, however, refer these cases to the bankruptcy judges for their districts.  28 U.S.C. § 157(a).  In accordance with section 157(a), the District Court for the Northern District of Illinois has referred all of its bankruptcy cases to the Bankruptcy Court for the Northern District of Illinois.  N.D. Ill. Internal Operating Procedure 15(a).

A bankruptcy judge to whom a case has been referred may enter final judgment on any proceeding arising under the Bankruptcy Code or arising in a case under the Bankruptcy Code.  28 U.S.C. § 157(b)(1).  Bankruptcy judges must therefore determine, on motion or *sua sponte*, whether a proceeding is a core proceeding or is otherwise related to a case under the Bankruptcy Code.  28 U.S.C. § 157(b)(3).  As to the former, the court may hear and determine such matters.  28 U.S.C. § 157(b)(1).  As to the latter, the bankruptcy court may hear the matters, but may not decide them without the consent of the parties.  23 U.S.C. §§ 157(b)(1), (c).  Instead, the bankruptcy court must "submit proposed findings of fact and conclusions of law to the district court, and any final order or judgment shall be entered by the district judge after considering the bankruptcy judge's proposed findings and conclusions and after reviewing *de novo* those matters to which any party has timely and specifically objected."  28 U.S.C. § 157(c)(1).

In addition to the foregoing considerations, a bankruptcy judge must also have constitutional authority to hear and determine a matter.  *Stern v. Marshall*, 564 U.S. 464 (2011).  Constitutional authority exists when a matter originates under the Bankruptcy Code or where the matter is either one that falls within the public rights exception, *id.*, or where the parties have consented, either expressly or impliedly, to the bankruptcy court hearing and determining the matter.  *See, e.g.*, *Wellness Int'l Network, Ltd. v. Sharif*, 135 S. Ct. 1932, 1939 (2015) (parties may consent to a bankruptcy court's jurisdiction); *Richer v. Morehead*, 798 F.3d 487, 490 (7th Cir. 2015) (noting that "implied consent is good enough").

As a complaint opposing dischargeability of a debt is a matter which stems from the bankruptcy case and a complaint objecting to a debtor's discharge may only arise in a bankruptcy case, this matter is expressly a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (I) & (J).  In accordance with *Stern*, 564 U.S. at 499, the bankruptcy court has authority to decide matters of nondischargeability, as the dischargeability of a debt is necessarily a matter that would stem from the bankruptcy itself.  "A bankruptcy judge has constitutional authority to enter final judgment as to dischargeability."  *Parkway Bank & Tr. v. Casali* (*In re Casali*), 526 B.R. 271, 274 (Bankr. N.D. Ill. 2015) (Schmetterer, J.); *see also Wan Ho Indus. Co., Ltd. v. Hemken* (*In re Hemken*), 513 B.R. 344, 350 (Bankr. E.D. Wis. 2014).  Further, each of the parties has either expressly or impliedly consented to this court's exercising authority over this matter.  As this court has explained, "[b]ecause the issue of whether a discharge should be revoked 'stems from the bankruptcy itself… the Court also has the constitutional authority to enter a final order[.]"  *Steege v Johnson* (*In re Johnson*), 551 B.R 384, 389 (Bankr. N.D. Ill. 2016) (Barnes, J.) (*quoting McDermott v. Davis* (*In re Davis*), 538 B.R. 368, 370 (Bankr. S.D. Ohio 2015)).

As a result, the court has jurisdiction, statutory authority and constitutional authority to hear and enter final judgment on this matter.

## BACKGROUND AND PROCEDURAL HISTORY[1]

The Plaintiff filed the Complaint based on allegations surrounding the relationship of the Defendant and the Decedent prior to his death on November 3, 2013. Compl., at ¶ 3. The Plaintiff alleges that, at the conclusion of the Decedent's life, the Decedent was unable to manage his health and finances, so he enlisted the assistance of the Defendant as caregiver to assist him in those tasks. *Id.* at ¶ 14. The Defendant's responsibility as caregiver involved receiving and opening the Decedent's mail, paying his bills, managing his medication and planning travel. *Id.* In order to complete her responsibilities, the Defendant was granted access to both the Decedent's debit card pin number and access to the Decedent's checkbook. Tr. at p. 79, Apr. 25, 2018.

The Plaintiff further alleges that, prior to the Decedent's death, the Decedent became extremely forgetful and confused and was often disorientated. Compl., at ¶ 6. The Plaintiff contends that the Defendant, through the Defendant's role as caregiver, was able to exploit the access she had to the Decedent's finances by writing and cashing unauthorized checks. *Id.* The Plaintiff further alleges that "throughout the period of at least three years prior to this [sic] death, [the Defendant] wrote regular checks to herself from [the Decedent's] bank account including but not limited [to] those allegedly representing her claimed 'salary.'" *Id.* at ¶ 7. The Defendant allegedly wrote checks to herself in excess of $600,000.00, which totaled more than double her claimed annual salary. *Id.* at ¶ 8. Even after the death of the Decedent, the Defendant continued to write checks to herself from the Decedent's account totaling a combined amount of $37,500.00. *Id.* at ¶ 10. The Plaintiff claims that the Defendant owed a duty to the Decedent and the transfer of substantial sums of money from his accounts was a breach of such duty. *Id.* at ¶ 16.

After failing to succeed on a motion to dismiss the Complaint, the Defendant filed her Answer to Plaintiff's Adversary Complaint [Adv. Dkt. No. 18] (the "Answer"). Through the Answer, the Defendant denies that the Decedent had any significant medical condition affecting his mental abilities. Answer, at ¶ 4. Further, the Defendant denies signing any checks drafted against the Decedent's bank account. *Id.* at ¶ 8. The Defendant also denies that the Decedent could not manage his health or financial affairs during the last three years of his life and, further, that the Decedent ever entrusted the Defendant with those responsibilities. *Id.* at ¶ 14.

The Defendant asserts in the Joint Pre-Trial Statement [Adv. Dkt No. 23] (the "Pretrial Statement") that she had a close relationship with the Decedent, a relationship that was more significant than that of a caregiver. Pretrial Stmt., at p. 12. The Defendant claims that this relationship was the result of the Decedent making the decision to never marry, have children or maintain any significant relationships with family members. *Id.* The Defendant does not deny that, through this special relationship, she received a wide range of financial benefits from the Decedent.

---

[1] The court has also taken into consideration all exhibits submitted along with the documents listed herein. As this is not an exhaustive list of the filings submitted in the Adversary, the court has taken judicial notice of the contents of the docket in the Adversary as well as the docket in the Defendant's underlying bankruptcy case, *In re Denitza Manevska*, Case No. 16bk30240 (Bankr. N.D. Ill. filed Sept. 22, 2016) (Barnes, J.). *See Levine v. Egidi*, Case No. 93C188, 1993 WL 69146, at *2 (N.D. Ill. Mar. 8, 1993) (authorizing a bankruptcy court to take judicial notice of its own docket); *In re Brent*, 458 B.R. 444, 455 n.5 (Bankr. N.D. Ill. 1989) (Goldgar, J.) (recognizing same).

The Defendant contends that she "was a more acceptable object of [the Decedent's] generosity than relatives with whom [he] had little contact and no emotional bonds." *Id.* at p. 13.

On April 25, 2018, the court conducted a half-day trial on the matter (the "Trial"). At the conclusion of the Trial, the parties were directed to submit their closing arguments via post-trial briefs. *See* [Scheduling] Order [Adv. Dkt. No. 37]. Both the Plaintiff and the Defendant submitted their post-trial briefs, though the Plaintiff's was one day late. Despite the tardiness of the Plaintiff's filing, the court has considered both post-trial briefs in determining this matter.

## FINDINGS OF FACT

From the review and consideration of the procedural background, as well as the evidence presented at the Trial and the filings in this Adversary, the court determines the salient facts to be and so finds as follows:[2]

a) The Decedent died on November 3, 2013 at the age of 93. Pretrial Stmt., at p. 14.

b) Twelve years prior to the Decedent's death, the Defendant began working as a caregiver to the Decedent and his two siblings who predeceased the Decedent. *Id.*

c) The Defendant had no formal training as a caregiver or care provider. *Id.*

d) The Decedent provided the Defendant with information regarding his ATM pin number and access to his checking account. Tr. at p. 79 Apr. 25, 2018.

e) The Defendant's agreed compensation was $2,000.00 a week in 2011 for her caretaking services and $2,500.00 a week in 2012 and 2013. *Id.* at pp. 79, 84.

f) Between January 1, 2011 and November 3, 2013, the Defendant drafted checks made out to herself against the Decedent's bank account totaling $617,410.00. *See* PX No. 1. (the "Summary of Checks"). This amount represents an overpayment of her salary totaling $283,410.00. *Id.*

g) The Defendant did not file tax returns in 2011, 2012 or 2013 on any salary earned while employed by the Decedent despite representing that the checks drafted from the Decedent's account served as compensation for her duties as caretaker. Tr. at p. 107, Apr. 25, 2018.

h) The Decedent signed checks prepared by the Defendant. Pretrial Stmt., at p. 14. The parties disagree as to whether the Decedent signed the checks before or after the Defendant completed any or all portions of the check.

i) The Defendant managed two bank accounts located at BMO Harris and PNC Bank. *Id.*; Tr. at p. 30, Apr. 25, 2018.

---

[2]     Unless otherwise noted, the background facts are derived from the facts agreed upon by both parties, as presented in the Pretrial Statement. Adjudicative facts may also be found and determined throughout this Memorandum Decision. To the extent that any of the findings of fact constitute conclusions of law, they are adopted as such, and to the extent that any of the conclusions of law constitute findings of fact, they are adopted as such.

j)  Other than BMO Harris and PNC Bank statements, the Defendant has failed to provide any records of her income, expenses or financial transactions from 2011 through 2013. Pretrial Stmt., at p. 14.

k)  The Decedent was admitted to Holy Cross Hospital from December 9 to 22, 2011. As part of his treatment, the Decedent had a breathing tube placed down his throat limiting his ability to speak for two days. Tr. at pp. 48-49, Apr. 25, 2018.

l)  Check No. 1819, made payable to the Defendant for $24,000.00, was drafted while the Decedent was admitted to Holy Cross Hospital in December 2011. Summary of Checks, at p. 10.

m)  The Decedent was again admitted to and discharged from Holy Cross Hospital sometime on or around February 10, 2012. Tr. at p. 51, Apr. 25, 2018.

n)  The Decedent was admitted to and discharged from Palos Community Hospital from November 1 to 3, 2012. *Id.* at p. 36.

o)  Check Nos. 2799, in the amount of $5,000.00, and 2800, in the amount of $5,080.00, were made payable to the Defendant and were signed and dated while the Decedent was admitted to Palos Community Hospital in November 2012. Summary of Checks, at p. 22.

p)  The Decedent was admitted to Holy Cross Hospital sometime on or around October 25, 2013. Tr. at p. 72, Apr. 25, 2018.

q)  The following checks, made payable to the Defendant, were all dated October 25, 2013, while the Decedent was admitted to Holy Cross Hospital. All checks contained a memo line of "for a [sic] 2 weeks."

    1.  Check No. 2925: $5,000.00

    2.  Check No. 2626: $4,000.00

    3.  Check No. 2927: $1,000.00

    4.  Check No. 2929: $4,000.00

Summary of Checks, at pp. 36-37.

r)  The Decedent was transferred to hospice shortly after being admitted to Holy Cross Hospital and passed away on November 3, 2013. Tr. at p. 72, Apr. 25, 2018.

s)  Two checks from the Decedent to the Defendant, Check Nos. 2701 and 2702, totaling $37,500.00, were dated after the Decedent passed away on November 3, 2013—on November 5 and 4, 2013, respectively. PX No. 2, at pp. 103, 102.

t)  Of the $617,400.00 the Defendant received via checks drafted against the Decedent's account, $161,583.37 is unaccounted for. PX No. 3 ("Summary of the Defendant's Deposits"). The evidentiary record is devoid of any explanation by the Defendant to account for the missing funds.

## DISCUSSION

The Complaint consists of two counts, as follows: Count I asserts a claim for nondischargeability under section 523(a)(4); Count II seeks denial of the Defendant's discharge under sections 727(a)(3), (a)(4)(D), (a)(5) and (a)(6)(A). The court will consider each Count in turn.

A.    Count I: 11 U.S.C. § 523(a)(4)

In Count I of the Complaint, the Plaintiff seeks a determination of the dischargeability of his claim against the Defendant, relying on subsection (a)(4) of section 523 in so doing. Section 523(a)(4) of the Bankruptcy Code states, in pertinent part, that a "discharge ... does not discharge an individual debtor from any debt—for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." 11 U.S.C. § 523(a)(4). "This section essentially contains two different exceptions—one for fraud or defalcation while acting in a fiduciary capacity and another for embezzlement or larceny while acting in any capacity." *Krischer v. Gibson (In re Gibson)*, 521 B.R. 645, 655 (Bankr. W.D. Wis. 2014), *aff'd*, Case No. 15-CV-783-BBC, 2016 WL 3248612 (W.D. Wis. June 13, 2016), *aff'd*, 682 F. App'x 505 (7th Cir. 2017).

> The party seeking to establish an exception to the discharge of a debt bears the burden of proof. *Goldberg Secs., Inc. v. Scarlata (In re Scarlata)*, 979 F.2d 521, 524 (7th Cir. 1992); *Harris Trust and Savings Bank v. Gunsteen (In re Gunsteen)*, 487 B.R. 887, 899 (Bankr. N.D. Ill. 2013) (Schmetterer, J.). A creditor must meet this burden by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291 (1991); *see also In re McFarland*, 84 F.3d 943, 946 (7th Cir. 1996).

*Muhammad v. Sneed (In re Sneed)*, 543 B.R. 848, 857-58 (Bankr. N.D. Ill. 2015) (Barnes, J.).

As this court has noted on several occasions, regardless of which party bears the ultimate burden, the proponent of the relief sought, whether it be a movant, applicant or, as in this case, a plaintiff, bears the initial burden of demonstrating at least a colorable claim for relief. *See, e.g., In re Bluberi Gaming Techs., Inc.*, 554 B.R. 841, 856 (Bankr. N.D. Ill. 2016) (Barnes, J.) ("In every matter before the court, regardless of what burdens may apply after, the movant bears the initial burden of demonstrating that it at least has a colorable claim to the relief it is requesting."); *In re Woods*, 517 B.R. 106, 116 (Bankr. N.D. Ill. 2014) (Barnes, J.) (same). Only once that burden has been met must an opposing party defend. In the context of section 523, the District Court has also stated that

> [w]hile the creditor must carry both the initial burden of production and ultimate burden of persuasion, the burden of going forward with the evidence shifts to the debtor in an appropriate case, and [Bankruptcy] Rule 4005 leaves to the courts "the formulation of rules governing the shift of the burden" (Advisory Committee's Note to Rule 4005; *In re Martin*, 698 F.2d 883, 887-88 (7th Cir. 1983)).

*Bank One-Rockford, N.A. v. Mayer (In re Mayer)*, 173 B.R. 373, 377 (N.D. Ill. 1994), *aff'd sub nom. Mayer v. Spanel Int'l Ltd.*, 51 F.3d 670 (7th Cir. 1995). Under the facts at bar, therefore, where the Plaintiff has met his initial burdens, the evidentiary burden shifts to the Defendant to show "at least a minimally credible explanation of [her] actions." *Martin*, 698 F.2d at 888. The ultimate burden remains, however, on the Plaintiff. *Id.*

Here, the Plaintiff alleges that all three elements of section 523(a)(4) have been met, namely that the Defendant committed fraud or defalcation while acting in a fiduciary capacity, that the Defendant committed embezzlement and that the Defendant committed larceny. The court will consider each theory in turn.

1.   *Fraud or Defalcation While Acting in a Fiduciary Capacity*

To satisfy this element of section 523(a)(4), "a creditor must prove that (1) 'the debtor acted as a fiduciary to the creditor at the time the debt was created,' and (2) 'the debt was caused by fraud or defalcation.'" *Estate of Cora v. Jahrling (In re Jahrling)*, 816 F.3d 921, 925 (7th Cir. 2016) (*quoting Follett Higher Educ. Grp., Inc. v. Berman (In re Berman)*, 629 F.3d 761, 765-66 (7th Cir. 2011)).

(a)   Fiduciary Capacity

"The existence of a fiduciary relationship under section 523(a)(4) is a matter of federal law." *Berman*, 629 F.3d at 767 (*citing to In re Frain*, 230 F.3d 1014, 1017 (7th Cir. 2000)). Thus, a party may act in a fiduciary capacity for the purposes of section 523(a)(4) without necessarily falling into the delineated role of fiduciary under applicable state law. While this may appear to give the statute more breadth, in application fiduciary capacity under section 523(a)(4) is construed more narrowly than it might be under state law. *Id.* at 767-68. This is in keeping with the general *proviso* that exceptions to discharge are to be construed narrowly. *In re Crosswhite*, 148 F.3d 879, 881 (7th Cir.1998) ("When deciding whether a particular debt falls within a § 523 exception, courts generally construe the statute strictly against the objecting creditor and liberally in favor of the debtor.").

In keeping with this narrow construction, the Seventh Circuit has stated that a fiduciary relationship for the purposes of section 523(a)(4) is "a difference in knowledge or power between fiduciary and principal which … gives the former a position of ascendancy over the latter." *In re Marchiando*, 13 F.3d 1111, 1116 (7th Cir. 1994). "A fiduciary relation only qualifies under § 523(a)(4) if it 'imposes real duties in advance of the breach.'" *Frain*, 230 F.3d at 1017 (*quoting Marchiando*, 13 F.3d at 1116)).

Nonetheless, the allegation of fiduciary capacity at bar appears to fall squarely within that narrow construction. In *Marchiando*, the Seventh Circuit noted that a fiduciary capacity could be where "someone—a lawyer for example, or a guardian, or a managing partner—in whom confidence is reposed is entrusted with another person's money for safekeeping." *Marchiando*, 13 F.3d at 1116. Even where no formal trust or fiduciary relationship might otherwise exist, where "one party to the relation is incapable of monitoring the other's performance of his undertaking, and therefore the law does not treat the relation as a relation at arm's length between equals." *Id.* at 1115-16; *see also Estate of Barlett v. Vaccaro (In re Vaccaro)*, Case No. 09B08674, Adv. No. 09A00476, 2010 WL 4053914, at *3 (Bankr. N.D. Ill. Oct. 14, 2010) (Sonderby, J.).

The record indicates that the Defendant had sole possession of information pertaining to the financials of the Decedent. Tr. at p. 79, Apr. 25, 2018. The Defendant alone possessed the Decedent's ATM pin number, in addition to control over the Decedent's checkbook. *Id.* The Defendant expressed during testimony that the Decedent had a great deal of trust in her, which is why she alone was entrusted with his PIN number. *Id.* There is also no indication that the Decedent monitored the Defendant's actions nor was she required to report account balances to the Decedent, or to anyone for that matter. The Defendant used that financial access to pay herself and

other creditors of the Decedent, *id.* at pp. 175-76, and did so at a time when the Decedent was particularly vulnerable. *Id.* at p. 73. The Decedent was a 93-year-old man who relied on the Defendant in her role as caregiver for daily support. *Id.*; *see also Vaccaro*, 2010 WL 4053914, at *3 (noting that the capacity arose "where the creditor/plaintiff is vulnerable due to advanced age, poor health, and isolation"). The Decedent's siblings predeceased him and his relationships with other family members were strained leaving him isolated and susceptible to financial abuse. Pretrial Stmt., at p. 13.

The facts presented before the court give little doubt that the Defendant owed a fiduciary duty to the Decedent.

      (b)    Fraud

"Fraud" for the purposes of section 523(a)(4) means "'positive fraud, or fraud in fact, involving moral turpitude or intentional wrong, as does embezzlement; and not implied fraud, or fraud in law, which may exist without the imputation of bad faith or immorality.'" *Bullock v. BankChampaign, N.A.*, 569 U.S. 267, 273 (2013) (*quoting Neal v. Clark*, 95 U.S. 704, 706 (1877)). Thus, fraud in these contexts is intentional deceit, not implied or constructive fraud. *Deady v. Hanson* (*In re Hanson*), 432 B.R. 758, 774 (Bankr. N.D. Ill. 2010) (Squires, J.), *aff'd*, 470 B.R. 808 (N.D. Ill. 2012). It includes "not only conduct that the fiduciary knows is improper, but also reckless conduct of the kind set forth in the Model Penal Code." *Bullock*, 569 U.S. at 273-74.

The Plaintiff asserts that the Defendant's misappropriation of funds and culpable state of mind are overwhelming evidence of her fraudulent actions. During the period in question, when the Decedent was ill and frequently hospitalized, the Defendant received checks exceeding her salary by more than $280,000.00. *See* Summary of Checks. Some of the checks were dated when the Decedent was in the hospital with a tube down his throat, unable to speak. Tr. pp. 177-78, Apr. 25, 2018; *see* Summary of Checks. Many of the Decedent's checks were also dramatically out of sequence.[5] The nonsequential dates of the checks makes the checks the subject of suspicion, a suspicion that the Defendant failed to quell. Further, the lack of sequential order makes it unlikely that the Decedent, as the Defendant testified, drafted and signed all checks at his kitchen table. Tr. at p. 30, Apr. 25, 2018. At least one of the checks was dated after the Decedent had died. Summary of Checks, at p. 35.

Courts within the Seventh Circuit have noted that among the hallmarks of fraud are mischaracterization, secrecy, concealment—actions inconsistent with legitimate conduct. *United States v. Lupton*, 620 F.3d 790, 802 (7th Cir. 2010); *United States v. Turner*, 551 F.3d 657, 665 (7th Cir. 2008). The transactions in this case bear the hallmarks of fraud. As such, the Plaintiff has carried his initial burden of establishing that the Defendant committed fraud and the burden now shifts to Plaintiff to provide "at least a minimally credible explanation of [her] actions." *Martin*, 698 F.2d at 888.

---

[5]      Check Nos. 2697, 2698, 2701, 2702 and 2710, totaling $68,480.00, were dated with these respective dates: March 19, 2012, June 13, 2012, November 5, 2013, November 4, 2013 and March 24, 2012. PX No. 2, at pp. 47, 57, 104 and 102. Check No. 2662, drafted in the amount of $30,000.00 and dated July 2, 2012, is roughly eight months out of sequence. *Id.* at p. 57.

In considering the Defendant's testimony, the court first observes that the Defendant was evasive, incomplete and dismissive of many of the questions asked her. She claimed a lack of recall on many of the important issues put to her and yet had a much more precise recall when it served her purposes. Her general demeanor lacked credibility. Her testimony was also objectively questionable. Tr. pp. 177-78, Apr. 25, 2018; *see* Summary of Checks.

At the Trial the Defendant expressed an understanding that there would not be any reason for her to write herself checks in amounts greater than her salary. Tr. p. 79, Apr. 25, 2018. However, a large amount of the checks she claims as income, over $280,000.00, exceeds the amount the Defendant testified she was owed under the applicable pay rates she testified to. *Id.* at pp. 79, 84; *see* Summary of Checks. The Defendant was unable to account for many of the checks written in excess of her weekly salary.

The Defendant suggested that some of the checks were gifts, Tr. p. 87, Apr. 25, 2018. at p. 87, but provided no evidence to support the intent to make a gift by the Decedent. In at least one specific case, the explanations offered contradicted the evidence available. When the Defendant explained that the $32,000.00 check drafted from the Decedent's account was for the purchase of a BMW, *id.* at p. 89, the check in question bears a memo line indicating that the funds were for three months of her salary. *Id.* at p. 91.

In further evaluating her intent, the Defendant also failed to treat any payments from the Decedent as income, failing to pay income tax in relation thereto. *Id.* at p. 107.

As the Seventh Circuit has noted, "[i]ntent may properly be inferred from the totality of the circumstances and the conduct of the person accused." *Kaye v. Rose (In re Rose)*, 934 F.2d 901, 904 (7th Cir. 1991). Here, the totality of the circumstances and the conduct of the Defendant make it clear to the court that the Defendant had the fraudulent intent underpinning a finding on this element of section 523(a)(4).

The Plaintiff has therefore sufficiently established that the hallmarks of fraud exist regarding the checks written to the Defendant and that the Defendant acted in bad faith in procuring funds from the Decedent. In return, the Defendant has failed to provide an even minimally credible explanation. As a result, the court concludes that the checks to the Defendant in excess of her salary were fraudulently obtained by the Defendant at a time when she acted in a fiduciary capacity to the Decedent. The Plaintiff has carried his ultimate burden under section 523(a)(4) and Defendant's debt to Plaintiff arising from these transactions is nondischargeable.

(c)   Defalcation

Once a debt has been determined to be nondischargeable on one ground, there are limited circumstances where a court need consider whether that debt is also nondischargeable on another. *Cervac v. Littman (In re Littman)*, 561 B.R. 79, 89 (Bankr. N.D. Ill. 2016) (Barnes, J.); *accord Thiara v. Spycher Bros. (In re Thiara)*, 285 B.R. 420, 426 (B.A.P. 9th Cir. 2002) (declining to consider alternative counts on appeal in a section 523 matter). Given that the precise interpretation of section 523(a)(4)'s elements has been the subject to many challenges both in and out of this jurisdiction, however, it is provident here to consider the Plaintiff's alternate contentions.

"Defalcation" under section 523(a)(4) "refers to the misappropriation of funds entrusted to one—a form of embezzlement." *Stoughton Lumber Co. v. Sveum*, 787 F.3d 1174, 1176 (7th Cir. 2015). Like fraud, defalcation requires an intentional wrong. *Bullock*, 569 U.S. at 273. Unlike fraud, there need be no "bad faith, moral turpitude, or other immoral conduct." *Id.* Defalcation "can encompass a breach of fiduciary obligation that involves neither conversion, nor taking and carrying away another's property, nor falsity." *Id.* at 275. Instead, it requires a knowledge or gross recklessness with respect to the improper nature of the fiduciary behavior. *Id.* at 274.

The court has noted above the problems and inconsistencies regarding the checks written to the Defendant in excess of her salary. There is little doubt that those same facts constitute a defalcation. As noted above, the Defendant's testimony demonstrated that she knew her salary, Tr. at pp. 79, 84, Apr. 25, 2018, and that she knew there was no reason to pay herself a salary in excess of that amount. *Id.* at p. 79.

As noted above, the court may infer intent under circumstances such as these. *Rose*, 934 F.2d at 904. As in *Vaccaro*, fraudulent intent is present here when there is the "misappropriation of and failure to account for property." *Vaccaro*, 2010 WL 4053914, at *4. The totality of the circumstances and the Defendant's conduct support a finding of requisite intent.

Once again, the Plaintiff's initial burdens have been carried and, once again, the explanations offered by the Defendant, as discussed above, are not minimally credible. As a result, the court concludes that by procuring the checks in excess of her salary from the Decedent, the Defendant committed defalcation at a time when she acted in a fiduciary capacity to the Decedent. The Plaintiff has carried his ultimate burden under section 523(a)(4) in this regard and the Defendant's debt to the Plaintiff arising from these transactions is nondischargeable for these reasons as well.

2.   *Embezzlement*

As noted above, the remaining, alternative allegations under section 523(a)(4) do not depend on a determination that the Defendant acted in a fiduciary capacity. For a debt to be nondischargeable under section 523(a)(4), the debtor must have been acting as a fiduciary *or* have either committed embezzlement or larceny. *In re Woldman*, 92 F.3d 546, 547 (7th Cir. 1996); *Marchiando*, 13 F.3d at 1116. The Plaintiff need not establish that the Defendant was acting in a fiduciary capacity. "In § 523(a)(4), the term 'while acting in fiduciary capacity' does not qualify the words 'embezzlement' or 'larceny'." *Herbstein v. Bruetman (In re Bruetman)*, 259 B.R. 649, 666 (Bankr. N.D. Ill. 2001) (Schmetterer, J.), *aff'd*, 266 B.R. 676 (N.D. Ill.), *aff'd*, 32 Fed. Appx. 158 (7th Cir. 2002). Consequently, the discharge exception for embezzlement applies to those persons who are not acting in a fiduciary capacity.

Embezzlement is defined as the "fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come." *In re Weber*, 892 F.2d 534, 538 (7th Cir. 1989) (*quoting Moore v. United States*, 160 U.S. 268, 269 (1895)). Embezzlement requires a showing that: (1) the debtor appropriated funds for his or her own benefit; and (2) the debtor did so with fraudulent intent or deceit. *Pierce v. Pyritz*, 200 B.R. 203, 205 (N.D. Ill. 1996). Using access that has been granted to funds to misappropriate those funds constitutes embezzlement. *Zamora v. Jacobs (In re Jacobs)*, 403 B.R. 565, 575 (Bankr. N.D. Ill. 2009) (Sonderby, J.).

Here, the Defendant does not dispute that she was entrusted with the Plaintiff's checkbook and had access to his checking account through it and his ATM card, nor does she refute that she drafted and deposited checks in excess of her annual salary. Tr. at p. 79, Apr. 25, 2018. The Defendant claims that some of the funds in excess of her salary were gifts, given to her by the Decedent to account for the special relationship that they developed over the twelve years where she served as caregiver for both the Decedent and his family. *Id.* at p. 159. In other instances, she states that the funds were given to purchase transportation that she used for the benefit of the Decedent. *Id.* at pp. 87-90. Other payments are identified as salary or for payments to be made to other caregivers by her. *Id.* at pp. 158, 19-20.

In addition to the Defendant's failure to testify credibly, as noted above, her explanations are contradicted by the evidence available, including the extraordinary amount of the checks in question, the nonsequential nature of the checks, the timing of the checks in relation to the Decedent's hospitalization and passing and the contradictory memo lines. Further, records that might have been examined in this regard were never produced by the Defendant. A much more plausible explanation is that the Defendant wrote these checks without the Decedent's knowledge.

When questioned at the Trial, the Defendant struggled to account for how she spent the money in question. The explanations offered by the Defendant lacked coherence and clarity. For instance, after the United States Trustee subpoenaed the Defendant, she produced tax returns from an art gallery run by her son indicating that she had an interest in the gallery. *Id.* at p. 106. However, the Defendant's schedules failed to account for such an interest. *Id.* The Defendant also testified that she gave $8,000.00 to her son to start the gallery, information similarly missing from her schedules. *Id.* at p. 107. The Defendant explained that a portion of the funds were sent back to Romania to assist in paying for a headstone and burial expenses for a family member. *Id.* at p. 181. The Defendant also claims to have repaid her son $27,000.00 she held on his behalf after the passing of his father. However, the Defendant failed to produce any record of a deposit into her account for the same amount or other evidence definitively corroborating these claims. *Id.* at pp. 114-15.

Given all of the foregoing, the totality of the circumstances and the Defendant's testimony support the inference that the Defendant both misappropriated funds entrusted to her for her own benefit and did so with fraudulent intent. *Rose*, 934 F.2d at 904; *Vaccaro*, 2010 WL 4053914, at *4.

Yet again, the Plaintiff has carried his initial burdens and the explanations offered by the Defendant, as discussed above, are not minimally credible. As a result, the court concludes that by procuring funds entrusted to her in excess of her salary from the Decedent, the Defendant committed embezzlement. The Plaintiff has carried his ultimate burden under section 523(a)(4) for embezzlement and the Defendant's debt to the Plaintiff arising from these transactions is nondischargeable for these reasons as well.

3.    *Larceny*

Larceny under section 523(a)(4) requires a finding that the debtor wrongfully took property from its true owner with intent to convert such property for personal use without the consent of the owner. *CFC Wireforms, Inc. v. Monroe (In re Monroe)*, 304 B.R. 349, 359 (Bankr. N.D. Ill. 2004) (Schmetterer, J.).

The Plaintiff alleges that the Defendant's actions constitute larceny because the Defendant took and carried away the property of the Decedent with the intent to convert said property to her own without the consent of the Decedent. Taking the Plaintiff's allegations at face value would mean that, having established the elements of embezzlement, larceny would follow.

However, "[e]mbezzlement differs from larceny only in that the original taking was lawful, or at least with the consent of the owner, unlike larceny, where there is a requirement that felonious intent exist at the time of the taking." *Rae v. Scarpello (In re Scarpello)*, 272 B.R. 691, 703 (Bankr. N.D. Ill. 2002) (Squires, J.); *see also* ROBERT E. GINSBERG & ROBERT D. MARTIN, GINSBERG & MARTIN ON BANKRUPTCY § 11.06[G][1] (5th ed. Supp. 2016).

Here, it appears to the court that the access granted the Defendant and the Defendant's use of that access to acquire the funds precludes a finding of larceny. The Plaintiff has, therefore, not carried his initial burden under section 523(a)(4) in this regard and the Defendant need not defend this allegation.

B.    Count II: 11 U.S.C. § 727

Though styled as one count, in Count II the Plaintiff challenges the Defendant's chapter 7 discharge under four theories set forth in sections 727(a)(3), (a)(4)(D), (a)(5) and (a)(6)(A) of the Bankruptcy Code. The court will address the propriety of each theory in turn.

As with Count I, the party attempting to establish that the discharge should not be given bears the ultimate burden of proof. *Scarlata*, 949 F.2d at 524. While the ultimate burden here lies with the Plaintiff, there first must be sufficient evidence present to satisfy the Plaintiff's burden of going forward with the evidence before the Defendant is required to rebut. *Martin*, 698 F.2d at 887. Only once the burden of going forward is satisfied must the Defendant then defend her case.

Unlike section 523, the focus of the inquiry under section 727 is not on the creditor's debt. Instead, the focus is on whether the debtor has violated the precepts of bankruptcy during his or her case, thus making the grant of a discharge improvident. As such, even though the court has found in favor of the Plaintiff under section 523, the inquiry under section 727 remains independent and germane.

1.    *11 U.S.C. § 727(a)(3)*

Section 727(a)(3) places an affirmative duty on a debtor to produce books and records that accurately document her financial affairs. *Peterson v. Scott (In re Scott)*, 172 F.3d 959, 969-70 (7th Cir. 1999). It states that the court shall deny a debtor a discharge under section 727(a)(3) if

> the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case.

11 U.S.C. § 727(a)(3). This provision ensures that creditors and trustees are provided with enough information to ascertain a debtor's financial condition without the need to resort to *post hoc* forensic investigation to assemble the financial transactions from chaos. *In re Juzwiak*, 89 F.3d 424, 427-28

(7th Cir. 1996). Section 727(a)(3) is aimed at ensuring that those with an interest in the bankruptcy case have "'complete and accurate information concerning the status of the debtor's affairs and to test the completeness of the disclosure relevant to discharge.'" *Jacobowitz v. The Cadle Co. (In re Jacobowitz)* 309 B.R. 429, 436 (*quoting Meridian Bank v. Alten*, 958 F.2d 1226, 1230 (3d Cir. 1992)).

The exception to discharge called for in section 727(a)(3) must be balanced against the overall purpose of the Bankruptcy Code, which is to provide "the honest but unfortunate debtor with a fresh start." *Grogan,* 498 U.S. at 280 ("The Code limits the opportunity for a completely unencumbered new beginning to the honest but unfortunate debtor by exempting certain debts from discharge."). However, section 727(a)(3) has no intent component. *Union Planters Bank, N.A. v. Connors*, 283 F.3d 896, 901 (7th Cir. 2002). As a result, the Seventh Circuit has advised that "[a]lthough the denial of discharge in bankruptcy 'should be construed strictly against the creditor and liberally in favor of the debtor,' such discharge is not a right, but a privilege." *Id. (quoting Juzwiak*, 89 F.3d at 427).

The Seventh Circuit has also noted that a debtor need not keep records in any special manner as the Bankruptcy Code does not speak to any rigid standard of record keeping. *Juzwiak*, 89 F.3d at 428. The court may therefore consider many factors when assessing the adequacy of the debtor's records. Among those factors are "the size, complexity, and nature of the debtor's business; his educational background and level of sophistication; his experience and business acumen; and his personal financial structure." *Clean Cut Tree Serv., Inc. v. Costello (In re Costello*), 299 B.R. 882, 897 (Bankr. N.D. Ill 2003) (Schmetterer, J.).

The party opposing discharge has the burden of proving that the records set forth by the debtor are unsatisfactory. Fed. R. Bank P. 4005. Once the party has demonstrated that a failure to keep complete and accurate records has made it problematic to ascertain the debtor's financial condition, the burden shifts to the debtor to show that a failure to keep records was reasonable. *Structured Asset Services, L.L.C. v. Self (In re Self),* 325 B.R. 224, 241 (Bankr. N.D. Ill. 2005) (Squires, J.); *Costello,* 299 B.R. at 897.

The Plaintiff has met his burden of going forward on this theory. The Plaintiff has provided the court with many instances in which the Defendant's records are incomplete or conflict with her testimony. While the Defendant has provided bank statements from her two accounts, the Plaintiff correctly observes that these statements provide little by way of the Defendant's financial condition. *See* PX Nos. 4 and 5. The bank statements are missing canceled checks and the Defendant has failed to provide those or, in the alternative, a checkbook ledger to account for the funds in question. *Id.* The Defendant made numerous transfers and cash withdrawals with no record as to where the money was applied.

Together, this absence of records makes it impossible to know where the funds went and the Defendant's testimony provided no clarity in this regard. For example, when the Plaintiff asked the Defendant to account for the deduction made from her account on March 28, 2013 for $73,521.04, Tr. at p. 122, Apr. 25, 2018, the Defendant responded that the transfer was to her son for money that she held on his behalf, which allowed him to purchase an apartment. *Id.* However, the Defendant did not provide any records indicating that that this sum of money actually belonged to her son, *id.* at pp. 123, 114, while at the same time failing to account for funds she claimed as hers.

In response, the Defendant argued that she qualifies for an exception to section 727(a)(3). The Defendant explains that her education consisted only of art school and she has no background in accounting or finance. As a normal consumer, the Defendant claimed that she had no special obligation to prepare and maintain books and records of her financial transactions and the absence of such records should not be held against her. Defendant's Closing Argument [Adv. Dkt. No. 28], at p. 9.

The Defendant is correct, in part, that as a general consumer, she had little or no obligation outside of bankruptcy to prepare and maintain records of her financial transactions. Even in bankruptcy, despite the express language of section 727(a)(3), such hapless consumers are likely to avail themselves of the justification exception contained within this section. *See* 11 U.S.C. § 727(a)(3) ("unless such act or failure to act was justified under all of the circumstances of the case"); *Schechter v. Hansen* (*In re Hansen*), 325 B.R. 746, 763 (Bankr. N.D. Ill 2005) (Goldgar, J.) ("In most cases, … holes in a consumer debtor's financial records will not be enough to invoke section 727(a)(3).").

The Defendant is not, however, as unsophisticated as she would have the court believe. Keep in mind that over $600,000.00 of the Decedent's funds flowed through the Defendant's accounts in less than three years. She assisted the Decedent in paying his bills and paid others in the Decedent's employ. Tr. at pp. 158, 19-20, Apr. 25, 2018. The Defendant had a minority interest in her son's art gallery and filed tax documents in relation thereto. *Id.* at p. 106. She transferred ownership in multiple cars. *Id.* at pp. 92, 104. Further, even if the Defendant were unsophisticated, the amount of missing funds is extraordinary. *See* PX No. 3. As Judge Goldgar has observed, "where there has been 'a sudden and large dissipation of assets,' the absence of records will warrant the denial of the debtor's discharge." *Hansen*, 325 B.R. at 763 (*quoting Self*, 325 B.R. at 240-41).

The Defendant has quite simply failed to fulfill her affirmative duties under section 727(a)(3) in light of the magnitude of the issues presented. The Defendant's failure to account for large amount of funds is not reasonable in this case. As a result, the Plaintiff has met his ultimate burden and the Defendant will be denied a discharge under section 727(a)(3).

    2.    *11 U.S.C. § 727(a)(4)(D)*

Section 727(a)(4)(D) denies a discharge to those debtors who intentionally withhold records or other documents relating to their property or financial affairs, thereby placing a duty to disclose on the debtor. *Fiala v. Lindemann* (*In re Lindemann*), 375 B.R. 450, 472 (Bankr. N.D. Ill. 2007) (Squires, J.). It states that the court shall deny a debtor a discharge if:

> the debtor knowingly and fraudulently, in or in connection with the bankruptcy case—withheld from an officer of the estate entitled to possession under this title, any recorded information including books, documents, records, and papers, relating to the debtor's property or financial affairs.

11.U.S.C. § 727(a)(4)(D).

Under section 727(a)(4)(D), not only must the Defendant have knowingly withheld recorded information, it must have been done with fraudulent intent. When determining intent, the court should consider a debtor's whole pattern of conduct. *In re Yonikus*, 974 F.2d 901, 905-06 (7th Cir.

1992); *Rezin v. Barr* (*In re Barr*), 207 B.R. 168, 176 (Bankr. N.D. Ill. 1997) (Schmetterer, J.). "The requisite intent to act knowingly and fraudulently 'may be established by circumstantial evidence, or by inference drawn from a course of conduct.'" *Bay State Milling Co. v. Martin* (*In re Martin*), 141 B.R. 986, 998 (Bankr. N.D. Ill. 1992) (Schmetterer, J.) (citation omitted). To satisfy his burden, the Plaintiff must therefore not only prove that the Defendant has or could have obtained records in connection with her financial affairs but also prove that the Defendant acted with the requisite intent. *Id.*

Here the Defendant does not dispute that she has not furnished documents so that the Plaintiff, the trustee and other creditors could better ascertain her financial affairs, but claims no such records exist. When asked if there were any documents that would help identify how the numerous withdrawals made from her account were used, the Defendant responded "No, I don't." Tr. at p. 116, Apr. 25, 2018.

Despite that response, it is clear that the Defendant has failed to provide truthful and accurate testimony and produce documents related to two vehicles in which she had interests. After receiving a Rule 2004 subpoena and exam, the Defendant failed to disclose the sale of the BMW she purchased with funds from the Decedent. PX No. 7 ("<u>Rule 2004 Exam Transcription</u>"), at p. 8. The Defendant stated at the examination that the BMW was sold for $4,000.00. Tr. at p 92, Apr. 25, 2018. However, when crossed on that issue at the Trial, the Defendant altered her testimony to acknowledge that her son traded-in the vehicle for a new Lexus where the Defendant served as cosigner. *Id.* at p. 104. As previously mentioned, the Defendant also failed to account for an interest that she had in art gallery run by her son, even after *she* produced tax documents that indicated she was a minority owner. *Id.* at p. 106.

There is ample evidence showing that the Defendant failed to provide a complete financial picture to all parties involved in this bankruptcy case. The Defendant has failed to disclose banking documents and has failed to produce documents relating to assets she owned. What is unclear is whether the Defendant withheld such information knowingly and with fraudulent intent.

In the court's estimation, the Plaintiff has failed to sufficiently explain how the Defendant's omissions are either knowing or rise to the level of fraud required under the statute. While a court may infer fraudulent intent from all facts and circumstances of the case, *Cent. Credit Union of Ill. v. Logan* (*In re Logan*), 327 B.R. 907, 911 (Bankr. N.D. Ill. 2005) (Cox, J.), the Plaintiff still bears the burden of demonstrating to the court how such inference should be made. As exceptions to the discharge are intended to be construed narrowly against the creditor and liberally in favor of the debtor, the court finds that the Plaintiff has not meet his burden of proof for the denial of a discharge under section 727(a)(4)(D).

3.    *11 U.S.C § 727(a)(5)*

Similarly, section 727(a)(5) prohibits a discharge of debts if "the debtor has failed to explain . . . any loss of assets or deficiency of assets to meet the debtor's liabilities." 11 U.S.C. § 727(a)(5). Under this section, a bankruptcy court has "broad power to decline to grant a discharge . . . where the debtor does not adequately explain a shortage, loss, or disappearance of assets." *Fed. Deposit Ins. Corp. v. Barrick* (*In re Barrick*), 518 B.R. 453, 462 (Bankr. N.D. Ill. 2014) (Cassling, J.) (*citing to Martin*, 698 F.2d at 886). As with section 727(a)(3), intent is not an element of section 727(a)(5).

There are two stages to the determination of a claim under section 727(a)(5). *Saluja v. Mantra (In re Mantra)*, 314 B.R. 723, 730 (Bankr. N.D. Ill. 2004) (Squires, J.). First, the creditor has the initial burden "of proving that the debtor at one time owned substantial and identifiable assets that are no longer available for his creditors." *Self*, 325 B.R. at 250. Second, after the creditor meets this initial burden, the burden then shifts to the debtor to satisfactorily explain the loss. *Id.*

The court has the discretion to determine what constitutes a "satisfactory" explanation of the loss. *Nuvell Credit Corp. v. Ross (In re Ross)*, 359 B.R. 690, 700 (Bankr. N.D. Ill. 2007) (Schmetterer, J.). The court need not determine if what happened to the asset was proper; it simply needs to evaluate whether the explanation given satisfactorily describes what happened to the asset. *Id.* While the Defendant's explanation does not need to be comprehensive, it must meet two criteria to be deemed "satisfactory." *Mantra*, 314 B.R. at 730. First, at least some documentation must support it. *Id.* Second, the documentation must be sufficient to "eliminate the need for the [c]ourt to speculate as to what happened to all the assets." *Id.* The debtor's explanation must consist of more than "a vague, indefinite, and uncorroborated hodgepodge of financial transactions…" *Id.* (citing to *Baum v. Earl Millikin, Inc. (In re Baum)*, 359 F.2d 811, 814 (7th Cir. 1966)). "Instead, it must be a good faith explanation of what really happened to the assets in question. *Olson v. Potter (In re Potter)*, 88 B.R. 843, 849 (Bankr. N.D. Ill. 1988) (Ginsberg, J.).

The Plaintiff has successfully demonstrated that the Defendant received income in her role as caregiver. Tr. at pp. 86-87, Apr. 25, 2018. In addition, the Plaintiff has demonstrated that the Defendant received additional sums of money far in excess of that income. *Id.* at p. 159. All told, the Defendant received over $600,000.00 from the Decedent in less than three years. The Plaintiff has therefore shown that the Defendant had substantial and identifiable assets. Despite this, the Defendant's amended schedules indicate that as of March 13, 2017, her checking account had a balance of $27.00. PX No. 10. Taken together, this is enough for the Plaintiff to meet his initial burden of showing that the Defendant once had substantial and identifiable assets that are no longer available to the Defendant's creditors.

The Defendant has attempted to describe the absence of the assets in question. She tendered some physical evidence by way of bank statements to account for the whereabouts of her income and to explain numerous cash withdrawals and wire transfers. These explanations were hopelessly incomplete. *See, e.g.*, Tr. at p. 184, Apr. 25, 2018 (explaining that, at the time she filed for bankruptcy, all of the money she had was gone). The issue of the apartment in Bulgaria illustrates this. As noted above, the Plaintiff sought an explanation of a large withdrawal from the Defendant's accounts on March 28, 2013. *Id.* at p. 122. In response, the Defendant testified that the transfer was to her son for money that she held on his behalf, which allowed him to purchase an apartment in Bulgaria, *id.* at p. 114, the Defendant provided no records to that effect. *Id.* Later, the Defendant explained that some of her money had gone to repair the apartment, *id.* at p. 116, an apartment she claims was owned by her son and not her. Other explanations involved helping family members, again with no records to support them. Even if these explanations were believable, none of them are meaningful in light of the magnitude of the missing funds.

The Defendant has failed to satisfactorily explain, within the meaning of section 727(a)(5), the loss and deficiency of the funds received from the Decedent. As section 727(a)(5) requires no showing of fraudulent intent, *Prairie Prod. Credit Assoc. v. Suttles (In re Suttles)*, 819 F.2d 764, 766 (7th Cir. 1987), the foregoing suffices and the Plaintiff has met his burden of proof. Denial of the Defendant's discharge is, therefore, also proper under section 727(a)(5).

4.    *11 U.S.C § 727(a)(6)(A)*

Section 727(a)(6)(A) provides that a court shall grant a debtor's discharge unless the debtor "has refused, in the case—to obey any lawful order of the court, other than an order to respond to a material question or to testify." 11 U.S.C. § 727(a)(6)(A). The Complaint details that the Defendant was issued a summons under Federal Rule of Bankruptcy Procedure 2004, which serves as a lawful court order. Compl., at ¶ 27. Defendant was asked to produce records relating to her bank accounts, in addition to documents relating to the trade-in of a Mercedes GLK. PX No. 8. However, the Defendant failed to produce the requested documentation. When asked if the Defendant attempted to get the requested records from her bank the Defendant responded: "No." Rule 2004 Exam Transcription, at p. 5. When the Defendant was asked if she acquired information pertaining to her vehicle, she stated that it was her intent to request the documents the following day from the dealership. *Id.* at p. 8. Ultimately, the Defendant never produced the requested records as required by the summons.

Section 727(a)(6)(A) gives the court discretion to determine if violation of a court's order is so severe as to require denial of discharge. *Clark v. Tieszen (In re Tieszen)*, Case No. 98B27403, 1999 WL 669263, at *8 (Bankr. N.D. Ill. Aug. 24, 1999) (Squires, J.). In exercising that discretion, the court notes that the offending acts alleged by the Plaintiff are each matters that could have been addressed with discovery orders under Federal Rules of Civil Procedure 37 and/or 45. The court is not of the opinion that simple discovery disputes should be, absent more such pattern of obstruction or willful contempt, escalated to the level of denial of discharge. The exception in section 7272(a)(6)(A) regarding material questions and testimony implies as much. Perhaps had orders under these rules been issued and refused, the matter would be different. As it stands, however, the Defendant's actions are better handled by the preceding sections.

Further, as the Fourth Circuit has noted, "the term in section 727(a)(6)(A) is 'refused' not 'failed.'" *Smith v. Jordan (In re Jordan)*, 521 F.3d 430, 433 (4th Cir. 2008). While the Plaintiff has demonstrated that the Defendant failed to comply with these requests, more must be done to demonstrate that the Defendant refused to comply. It was not, and the court therefore declines relief under this section.

## CONCLUSION

The court therefore finds that the Plaintiff has proven by a preponderance of the evidence that section 523(a)(4) has been satisfied and that the Defendant's debt due to the Plaintiff is not dischargeable. The Defendant has committed fraud and defalcation while acting in a fiduciary capacity and has committed embezzlement. Further, the Plaintiff has proven by a preponderance of the evidence his claims under sections 727(a)(3) and (a)(5). The Defendant will be denied a discharge in her bankruptcy case.

As a result, by separate judgement order entered concurrently herewith, judgment in favor of the Plaintiff will be rendered on both Counts of the Complaint.

Dated: August 8, 2018

ENTERED:

Timothy A. Barnes
United States Bankruptcy Judge